IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JANINE LARIE MURPHY, | ) | CASE NO. 1:14CV1711 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE PATRICIA A. GAUGHAN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Janine Larie Murphy ("Murphy") seeks judicial review of the final decision of
Defendant Commissioner of Social Security ("Commissioner") denying her application for
Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42
U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report
and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the Administrative Law Judge ("ALJ") failed to explain
adequately her Step Three finding that Murphy's impairments did not meet or medically equal
Listing 12.04, Affective Disorders. Accordingly, the undersigned recommends that the
Commissioner's decision be **REVERSED and REMANDED**.

## I. Procedural History

Murphy protectively filed an application for SSI on August 10, 2011, alleging a disability
onset date of August 1, 2007.  Tr. 49, 262.  She alleged disability based on the following: heart
condition, depression, back and hip pain, bladder problems, diabetes, arthritis, difficulty
sleeping, memory and concentration problems, and breathing problems.  Tr. 277.  After denials

1

by the state agency initially (Tr. 117) and on reconsideration (Tr.136), Murphy requested an administrative hearing.  Tr. 38.  A hearing was held before Administrative Law Judge ("ALJ") Pamela E. Loesel on December 20, 2012.  Tr. 67-101.  In her February 20, 2013, decision (Tr. 49-59), the ALJ determined that there were jobs that existed in significant numbers in the national economy that Murphy could perform, i.e., she was not disabled.  Tr. 57.  Murphy requested review of the ALJ's decision by the Appeals Council (Tr. 38) and, on June 10, 2014, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A.  Personal and Vocational Evidence

Murphy was born in 1966 and was 44 years old on the date her application was filed.  Tr. 57, 254.  She completed tenth grade.  Tr. 239.  She previously worked as a finisher at a metal finishing business and as a laborer for a phone book distributer.  Tr. 235.  She last worked in July 1997.  Tr. 235.

### B.  Relevant Medical Evidence[1]

On January 17, 2011, Murphy saw psychiatrist Byong J. Ahn, M.D., for a psychiatric evaluation.[2]  Tr. 920.  Murphy complained of physical problems, anger, fatigue, and mood swings.  Tr. 920.  She "had thoughts of death wish and suicidal thoughts. She wishes she could crash her car against the wall, but she refuses to do this because of her children."  Tr. 920.  She reported a history of cutting herself and overdosing on pills. Tr. 920.  She had negative thoughts about "everybody around her" and believed she had no friends due to her skin condition,

---

[1]  Murphy only challenges the ALJ's findings with respect to her mental impairments.  Doc. 9, p. 11.  Accordingly, only the medical evidence relating to her mental impairment is summarized herein.

[2]  Murphy later reported that she saw Dr. Ahn at the behest of the state welfare department for an evaluation to see if she could work.  Tr. 907.

psoriasis.  Tr. 921.  She reported angry outbursts, punching walls, hitting people, and smashing

things.  Tr. 921.  She believed that nothing would make her happy, had a hard time trusting

people, and had "very low self-esteem."  Tr. 921.  She denied hallucinations and "well-organized

delusions."  Tr. 921.

Upon examination, Dr. Ahn described Murphy as "a little unkempt."  Tr. 921.  She

looked down and was depressed, irritated and angry.  Tr. 921.  Dr. Ahn described her mood as

"down," "irritable," and "dysphoric."  Tr. 921.  He noted that she continued to have thoughts of

death and suicide intermittently.  Tr. 921.  She had problems sleeping because of pain and racing

thoughts.  Tr. 921.   She considered herself a burden to her family and society and said that

people would be better off if she were dead, but that she still thinks of her children.  Tr. 921.  Her

affect was "rather blunted," restricted, and "a little bit irritated."  Tr. 921.  Her insight was

moderate and her cognitive functioning was not impaired.  Tr. 921.  Dr. Ahn diagnosed Murphy

with possible major depression and possible bipolar disorder.  Tr. 921.  He assessed a "current"

Global Assessment Function[3] ("GAF") score of 40 and "last year 50."  Tr. 922.  He prescribed

Zoloft, Zonegran and Risperdal.  Tr. 922.

On March 22, 2011, Murphy saw Dr. Ahn again.  Tr. 919.  Murphy reported that she

"is not any better, but she is able to sleep better about 6 hours."  Tr. 919.  She still felt down and

depressed and had "thoughts of death wish."  Tr. 919.  She was "tired of her medical illness and

everything bothering her."  Tr. 919.  Dr. Ahn observed that Murphy's affect was "still somewhat

---

[3]  GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a
hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical
Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric
Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 31 and 40 indicates "some impairment in reality
testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several
areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends,
neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing
at school)."  *Id.*  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning
(e.g., few friends, unable to keep a job)."  *Id.*

restricted" but that she denied having hallucinations.  Tr. 919.  He increased her Zoloft dosage. Tr. 919.

On May 16, 2011, Dr. Ahn's treatment note reads, "[Murphy] still feels down and depressed, is not able to sleep, grouchy and dysphoric."  Tr. 918.  Dr. Ahn discontinued her Risperdal and prescribed Seroquel for her sleeping problems.  Tr. 918.  On July 11, 2011, Murphy reported being "very upset because she might have to go to some classes, which is demanded by the Welfare Department."  Tr. 919.  She reported physical problems and her continuing but, to date, failed efforts to obtain disability.  Tr. 919.  She complained that she could not concentrate, felt sad and down, and did not understand what was going on.  Tr. 919. Dr. Ahn noted that Murphy had anxiety and frustration toward society which she blamed on her history of being abused, molested and raped.  Tr. 917.  She commented that she does not want to be around people and she wants to be alone.  Tr. 917.  She reported sleeping better on the Seroquel and "doing a little bit better."  Tr. 917.

On October 3, 2011, Murphy reported to Dr. Ahn that she was "still not sleeping well." Tr. 916.  She stated that Seroquel was no longer helping her sleep.  Tr. 916.  She was still feeling down and depressed and stated that she lacked energy and motivation.  Tr. 916.  She denied dangerous ideations and Dr. Ahn commented that her affect was "somewhat blunted and she was grumpy and grouchy."  Tr. 916.  He increased her Seroquel and Zoloft.  Tr. 916.

On February 2, 2012, Murphy reported to Dr. Ahn that she was not sleeping very well and felt exhausted.  Tr. 915.  She stated that some nights she could sleep but that other nights she did not sleep at all, and that the increased Seroquel did not help her much.  Tr. 915.  She reported no major side effects from her medications.  Tr. 915.  Dr. Ahn increased her Seroquel further as well as her Zonisamide.  Tr. 915.

On April 26, 2012, Murphy reported that she was not feeling well or sleeping well.  Tr. 937.  On July 19, 2012, she was "having a lot of trouble and not able to sleep since the Seroquel was discontinued but the Trazadone is not making her sleep."  Tr. 936.  She was sleeping 2 to 3 hours a night.  Tr. 936.  Dr. Ahn remarked that she was "kind of upset and angry" at her doctors because they were not listening to her despite her assertions that she was unable to do things.  Tr. 936.  She denied having dangerous ideas.  Tr. 936.

### C.  Function Report

On September 9, 2011, Murphy filled out an Adult Function Report.  Tr. 303-310.  Describing her daily activities, she wrote, "wake up take pills and injections, nap because of pills cry take night pills and injections and go to try to sleep."  Tr. 304.  She tries to take care of her two younger children but she is unable to do much and her older children help her.  Tr. 304.  She does not need special reminders to take care of her personal needs and grooming, but she stated, "I just don't care."  Tr. 305.  Her children remind her to take her medications.  Tr. 305.  She cooks once a month; her children "do the cooking mostly."  Tr. 305.  She does not do household chores other than vacuum, which causes her pain.  Tr. 305.  She rarely goes outside and when she does, she takes one or all of her daughters with her.  Tr. 306.  She enjoys watching TV and playing computer games but since her conditions began she lacks concentration.  Tr. 307.  She does not spend time with others except for a family reunion once a year.  Tr. 307.  She needs reminders to go places and does not "take part in anything."  Tr. 307.  She has problems getting along with others.  Tr. 308.  She can pay attention for ten minutes.  Tr. 308.  She indicated that she has no difficulty understanding or following written instructions, but also noted that she does not follow spoken instructions well and "sometimes" can follow written instructions.  Tr. 308.  She does not get along well with authority figures and does not associate with others.  Tr. 308.

She does not handle stress well, explaining that stress caused her to have two heart attacks and psoriasis.  Tr. 309.  She also stated that she is scared of water, heights, and that she wants to sit alone in a corner.  Tr. 309.  Most of her medications cause her drowsiness or dizziness. Tr. 310.

### D.  Medical Opinion Evidence

#### 1.  Treating Source Opinion

On December 13, 2012, Dr. Ahn completed a mental Medical Source Assessment.  Tr. 989-990.  He opined that Murphy could understand, remember, and carry out very short, simple instructions and make simple work-related decisions.  Tr. 989.  He stated that she is able to perform the following tasks, but has or will have noticeable difficulty in doing so more than 20% of the work day or work week: perform activities within a schedule, maintain regular attendance, and/or be punctual within customary tolerances; work in coordination or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers; and complete a normal workday and workweek without interruption from psychological[ly] based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 989.   He opined that she is able to perform the following tasks, but has or will have noticeable difficulty in doing so for more than 11% to 20% of the work day or work week: understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods of time; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  Tr. 989-990.  He estimated that Murphy is likely to be absent two to three days per month and off-task 15% of the day due to her mental health related symptoms. Tr. 990.  He explained,

> I do not see how this [patient] functions other than what she reports in my office.  Her primary complaints are about medical concerns that limit her ability to function.  Her

> mental condition of depressive symptoms persist but at a decreased level with
> medication.  She continues to have difficulty [sleeping] which causes irritation.

Tr. 990.  In support of his assessment, he cited Murphy's report of symptoms, his interaction

with her during the assessment, and her self-reporting response to her medications.  Tr. 990.

### 2.  Consultative Examiners

On September 29, 2010, prior to her current disability application, Murphy saw Thomas

Evans, Ph.D., for a consultative examination.  Tr. 596-600.   Dr. Evans described Murphy as

cooperative and friendly throughout the interview and that rapport was easily established and

maintained, but noted that she was lethargic and made poor eye contact.  Tr. 597.   Her hair was

long and well-kept and her personal grooming and hygiene were good.  Tr. 597.  She reported

difficulty sleeping.  Tr. 598.  Her mood and affect were constricted.  Tr. 598.

Dr. Evans diagnosed Murphy with a Dysthymic Disorder.  Tr. 599.  He opined that her

ability to concentrate was not impaired, her ability to relate to others was moderately impaired

but that she avoids people whenever possible, that her activities of daily living were reduced due

to her physical condition, and that her ability to withstand stress and pressure was markedly

impaired.  Tr. 599.  Dr. Evans assigned her a GAF score of 53.  Tr. 600.

On November 3, 2011, after Murphy applied for disability, she saw Ronald H. Smith,

Ph.D., for a consultative examination.  Tr. 904-911.  Murphy relayed a prior charge of domestic

violence and assault.  Tr. 905.  When Dr. Smith asked how she got along with people on the job,

Murphy replied that she did not associate with people at work and never liked to associate with

people, "period."  Tr. 905.  She stated, "They don't like me and I don't like them."  Tr. 905.  Her

activities of daily living include getting up at noon or 1 p.m., taking her pills, going back to bed

and doing "nothing much."  Tr. 909.  Her kids helped her with housework and shopping.  Tr.

909.

Upon examination, Dr. Smith noted that Murphy was unkempt and grumpy, though generally cooperative throughout the examination.  Tr. 907.  She denied she ever cried and did not appear tearful.  Tr. 908.  She described feeling angry and having thoughts of suicide, although she did not carry them out, stating that her "kids keep me going."  Tr. 908.  She described how she got angry because she threw a baby shower for her daughter but then someone else "put on a better baby shower just to show me up."  Tr. 908.  She saw ghosts and spirits in her house.  Tr. 908.  She generally performed well on cognitive functioning tests.  Tr. 908.  Dr. Smith diagnosed her with a dysthymic disorder, an unspecified impulse control disorder, and an unspecified personality disorder.  Tr. 909.  He assigned a GAF of 50.  Tr. 910.  Regarding Murphy's ability to work, Dr. Smith opined that she could understand and follow instructions but that she might be distracted maintaining her concentration when she is angry.  Tr. 910.  She would have "considerable difficulty dealing with people including fellow workers and supervisors in a work setting" because of her dislike of people and her anger issues and would have difficulty handling work pressure.  Tr. 910-911.

### 3.  State Agency Reviewers

On November 21, 2011, Karen Steiger, Ph.D., a state agency psychologist, reviewed Murphy's file.  Tr. 126-128.  Dr. Steiger opined that Murphy did not meet or medically equal Listings 12.04 (Affective Disorders), 12.06 (Anxiety-related Disorders), or 12.08 (Personality Disorders).  Tr. 127.  Dr. Steiger found that Murphy had mild restrictions in activities of daily living and moderate restrictions maintaining social functioning and concentration, persistence or pace and that she had no episodes of decompensation.  Tr. 127.

On May 30, 2012, state agency psychologist Robyn Hoffman, Ph.D., affirmed Dr. Steiger's opinion.  Tr. 144-145.

### E.  Testimonial Evidence

#### 1.  Murphy's Testimony

Murphy was represented by counsel and testified at the administrative hearing.  Tr. 68-93.  She lives with her four daughters ranging in age from 22-13 and a one-year-old granddaughter.  Tr. 74-75.  She does not cook, clean or shop for groceries; her daughters perform these chores.  Tr. 75.  She goes shopping with them "once in a blue moon."  Tr. 76.  In a typical day, she spends four to five hours sitting at the computer "look[ing] at other people's stuff" but not conversing with others; she "ignore[s] them."  Tr. 76.  She occasionally has contact with her mother and two out of her eight siblings.  Tr. 77.  She is not involved in any social groups.  Tr. 77.

Murphy testified that she is able to drive.  Tr. 77.  To get to the hearing she took public transportation, though she drove to the hearing site the day before so that she would know how to get to the site.  Tr. 77.  The longest she has driven in the last year is a 45-minute drive.  Tr. 78.  She usually drives to her doctor appointments and she takes her daughter with her.  Tr. 78.

Murphy last worked 15 years ago as a finisher, lifter, and machinist.  Tr. 78-79.  She used to lift a lot of weight at work but is now unable to do so; she stated that she cannot lift her granddaughter, who weighed about 27 pounds.  Tr. 80.  She has been a diabetic for six years and her blood sugar is up and down "like a roller coaster," causing her to feel "lousy" and angry.  Tr. 81.  She gets tingling in her hands "every other day" and cannot use her hands and has tingling and pains in her legs.  Tr. 82-83.  She also has psoriasis.  Tr. 83.  She develops plaques from her psoriasis once or twice a month that cause burning and itching and crack open, causing pain that "cut[s] like a knife."  Tr. 84.  She gets plaques on her arms, legs, back, buttocks, face, and scalp, and they last for a week to a week and a half.  Tr. 84.

Murphy stated that she also has chronic obstructive pulmonary disease and has coughing fits two to three times a day.  Tr. 85.  She also has heart problems, coronary artery disease, back problems, and problems with her feet.  Tr. 85-87.  She saw a psychiatrist in January 2011 because she was punching holes in her walls, "going after my children verbally," and fighting with the neighbor.  Tr. 87.  She takes medication for her mental problems as well as her problems sleeping.  Tr. 88.  She also has low self-esteem.  Tr. 88.  She hates herself and thinks about hating herself the "majority of the day."  Tr. 88.  She hates the way she looks and stated that throughout her life people have judged her because of her psoriasis.  Tr. 88-89.

Murphy testified that she does not go outside the house much unless she is forced to.  Tr. 89.  She sometimes goes out at night when everyone is asleep to a 24-hour store so she does not have to deal with people.  Tr. 89.  She cannot stand the looks they give her.  Tr. 89.  She wants to hit whoever is looking at her wrong because they are looking at her up and down.  Tr. 89.  She wears sunglasses and she "can see what they look at me like."  Tr. 89.  This causes her to wonder, "Why am I like this? Why am I here? Am I on this earth to be treated bad or what? You don't know what it's like to have someone walk down the street and see you and cross the road."  Tr. 89.  When she gets mad she will hit things such as her car, her walls, and the floor.  Tr. 89-90.  She does not hit people "because when I really get ticked off I'm afraid I'll really hospitalize somebody or kill them."  Tr. 90.  Her anger is set off by major things and minor things, "depend[ing] on how I am that day," for example if she wakes up "grumpy."  Tr. 90.

Murphy stated that when she gets up, she makes her coffee and sits down until she starts hurting, then she moves around until she hurts from moving, and then sits back down.  Tr. 90.  She watches her granddaughter "run around the floor" and watches her daughters play with her and she also watches some television.  Tr. 90.  She watches ghost stories on television.  Tr. 90.

When she is mad or depressed she is not able to watch television because "I'll see something on TV and it'll make me mad.  A scenario that's a stupid scenario and I'll get mad at it."  Tr. 91.  She has her own room in the house and she spends most of her time in her room, hiding from everybody. Tr. 91.  She stated that today was the first day she took public transportation in 13 years and she could not stand it; she did not like being at the hearing and she wanted to be at home. Tr. 91.  She was supposed to go to classes for welfare but she did not go because "I couldn't."  Tr. 92.  The classes were eight hour classes and she "can't sit anywhere for eight hours" because when she coughs she wets herself.  Tr. 92.  She had a partial hysterectomy with mesh inserted that was supposed to address her problem but instead "it made everything worse." Tr. 93.

### 2. Vocational Expert's Testimony

 Vocational Expert Nancy J. Borgeson ("VE") testified at the hearing.  Tr. 94-100.  The ALJ discussed with the VE Murphy's past relevant work as metal finisher.  Tr. 95.  The VE stated that metal finisher is ordinarily classified as light work but that, based on Murphy's testimony, Murphy performed it at the very heavy level.  Tr. 95.  The ALJ asked the VE to determine whether a hypothetical individual of Murphy's age, education and work experience could perform the jobs she performed in the past if that person had the following characteristics: can occasionally lift 20 pounds and frequently lift 10 pounds; can stand and walk two to four hours in an eight-hour workday; can sit for six hours in an eight-hour workday; can push and pull an unlimited amount other than the lift/carry restrictions; can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; can frequently balance; can occasionally stoop and crouch but can never kneel or crawl; must avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation; must avoid even moderate exposure to hazards, such as dangerous

machinery and unprotected heights; can complete simple routine tasks consistent with unskilled work; can understand and carry out instructions; can interact superficially with others, i.e., for a short duration for a specific purpose; is limited to a static work environment, i.e., infrequent change; and can perform low-stress work, i.e., no high production quotas, piecework, arbitration, negotiation, confrontation, responsibility for the safety of others, or supervisory responsibility. Tr. 95-96.  The VE testified that the person could not perform Murphy's past relevant work as it is ordinarily performed or as she performed it.  Tr. 96-97.  The ALJ asked the VE if there were any jobs that the individual could perform and the VE answered that the individual could perform jobs as a general office clerk, such as a charge account clerk (2,100 northeast Ohio jobs; 10,000 Ohio jobs; 220,000 national jobs), table worker (1,000 northeast Ohio jobs; 5,000 Ohio jobs; 102,000 national jobs), and order clerk in the food and beverage industry (1,800 northeast Ohio jobs; 9,000 Ohio jobs, 215,000 national jobs).  Tr. 97-98.

The ALJ asked the VE whether such an individual could perform those jobs if the individual would need to change position every 30 to 60 minutes.  Tr. 98.  The VE answered that such an individual could perform those jobs as long as they did not leave the work site.  Tr. 98. The ALJ asked the VE whether the hypothetical individual could perform those jobs if the individual might be absent two to three days per month.  Tr. 98.  The VE answered that the individual could perform the job tasks but would not be able to sustain full-time work.  Tr. 98. The ALJ asked the VE whether the hypothetical individual could perform those jobs if the limitation regarding absenteeism was removed and the following limitation was added: the individual would need a 15-minute rest every hour of the workday.  Tr. 98-99.  The VE answered that the individual could perform the job tasks but would need a special accommodation for a 15-

minute rest every hour and could not, therefore, perform a full-time job without a special accommodation.  Tr. 99.

Next, Murphy's attorney asked the VE whether the first hypothetical individual the ALJ described could perform the jobs previously identified by the VE if the individual had the following additional limitation: can only have contact with other people, including supervisors, coworkers, or the general public, five percent of the day or less, and such contact would be described as not interacting but merely being around people ("line of sight kind of thing").  Tr. 99-100.  The VE answered that the jobs she previously mentioned would be eliminated "for the most part" because it is difficult to predict that there would not be people around more often than not.  Tr. 100.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her February 20, 2013, decision, the ALJ made the following findings:

1.      The claimant has not engaged in substantial gainful activity since August 10, 2011, the application date.  Tr. 52.

2.      The claimant had the following severe impairments: insulin dependent diabetes mellitus, diabetic retinopathy, diabetic neuropathy, coronary

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

artery disease, sebaceous dermatitis, psoriatic arthritis, plantar fasciitis, obesity, chronic obstructive pulmonary disease, affective disorder (depression), anxiety disorder, personality disorder. Tr. 52.

3. The claimant does not have an impairment or combination of impairments that meet or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 52.

4. The claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except able to occasionally lift 20 pounds and frequently life 10 pounds, is able to stand and walk two to four hours of an eight-hour workday, is able to sit for six hours of an eight-hour workday, unlimited push/pull other than shown for lift and/or carry; occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; frequently balance; occasionally stoop and crouch; never kneel or crawl; avoid concentrated exposure to extreme cold and extreme heat; avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc; avoid even moderate exposure to hazards—should avoid dangerous machinery and unprotected heights; can complete simple routine tasks consistent with unskilled work; capable of understanding and carrying out instructions; can interact superficially with others (meaning of short duration for a specific purpose); is limited to a static work environment meaning infrequent change; can perform low stress work with no high production quotas, piece work, arbitration, negotiation, confrontation, responsibility for the safety of others or supervisory responsibility; requires position changes every 30 to 60 minutes. Tr. 54.

5. The claimant is unable to perform her past relevant work. Tr. 57.

6. The claimant was born on August 17, 1966 and was 44 years old, which is defined as a younger individual age 18-49 the day the application was filed. The claimant attained the age of 45 on August 16, 2011, under the Social Security Act, and is now described as a younger individual age 45-49. Tr. 57.

7. The claimant has a limited education and is able to communicate in English. Tr. 57.

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Tr. 57.

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 57.

10.     The claimant has not been under a disability, as defined in the Social Security Act, since August 10, 2011, the date the application was filed. Tr. 58.

## V. Parties' Arguments

Murphy objects to the ALJ's decision on two grounds.  She argues that the ALJ erroneously found that she did not meet Listing 12.04[5] of the listed impairments because the ALJ "did not fully consider the opinions and findings of [Murphy's] treating psychiatrist as well as other examining sources."  Doc. 9, pp. 10-19.  She argues that the ALJ improperly relied upon a non-treating, non-examining state agency opinion over the opinions of her treating psychiatrist, Dr. Ahn, and consultative examiners Drs. Evans and Smith, in finding that she did not meet Listing 12.04.  Doc. 9, p. 13.  She also argues that the ALJ failed to provide a "valid hypothetical" to the VE incorporating the opinions of Drs. Ahn and Smith.  Doc. 9, p. 18.  In response, the Commissioner submits that the ALJ reasonably found that Murphy did not meet or equal any listing.  Doc. 11, pp. 4-8.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

---

[5]  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A.  Listing 12.04

Listing 12.04, Affective Disorders, is

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

    A. Medically documented persistence, either continuous or intermittent, of one of the following:

        1. Depressive syndrome characterized by at least four of the following:

            a. Anhedonia or pervasive loss of interest in almost all activities; or
            b. Appetite disturbance with change in weight; or
            c. Sleep disturbance; or
            d. Psychomotor agitation or retardation; or
            e. Decreased energy; or
            f. Feelings of guilt or worthlessness; or
            g. Difficulty concentrating or thinking; or
            h. Thoughts of suicide; or
            i. Hallucinations, delusions, or paranoid thinking; or

        2. Manic syndrome characterized by at least three of the following:

            a. Hyperactivity; or
            b. Pressure of speech; or
            c. Flight of ideas; or
            d. Inflated self-esteem; or
            e. Decreased need for sleep; or
            f. Easy distractability; or
            g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
            h. Hallucinations, delusions or paranoid thinking; or

        3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

17

       B. Resulting in at least two of the following:
          1. Marked restriction of activities of daily living; or
          2. Marked difficulties in maintaining social functioning; or
          3. Marked difficulties in maintaining concentration, persistence, or pace; or
          4. Repeated episodes of decompensation, each of extended duration;

OR

       C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
          1. Repeated episodes of decompensation, each of extended duration; or
          2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
          3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 CFR Pt. 404, Subpt. P, App. 1.

The ALJ considered Listing 12.04, but determined that Murphy did not satisfy the requirements of 12.04(B), the "paragraph B criteria."  Tr. 52.  Specifically, the ALJ found that Murphy had a mild restriction in activities of daily living, moderate difficulties in social functioning and concentration, persistence or pace, and no episodes of decompensation of extended duration.  Tr. 53.  The ALJ also found that Murphy failed to meet the "paragraph C criteria."  Tr. 53.

Murphy argues that she meets Listing 12.04(B) because she has marked restrictions in two sections described above—activities of daily living and social functioning—and challenges the ALJ's finding that she did not meet 12.04(C)(2).  Doc. 9, pp. 14-17.  Her assertion is entwined with her contention that the ALJ did not properly consider the treating and examining opinion evidence in the record.

**B. The "paragraph B criteria"**

As noted, to satisfy the paragraph B criteria, the claimant must show that she has a marked restriction in two of the following areas: activities of daily living, maintaining social functioning, or maintaining concentration, persistence, or pace.

### 1. Activities of daily living

The ALJ stated,

> In activities of daily living, the claimant has mild restriction.  The claimant is able to perform self-care and drive.  She testified that she has her children performing cleaning and shopping.  Because of her high degree of independence, appropriateness, effectiveness and sustainability of activities, any difficulties are no more than mild.

Tr. 52.[6]

The ALJ did not explain how Murphy's ability to drive and perform self-care illustrates a "high degree of independence, appropriateness, effectiveness, and sustainability of activities," nor did she state what opinion evidence, if any, she relied on in support of her finding that Murphy has a mild restriction.  Later in her decision, the ALJ credited the mental residual functional capacity ("RFC") assessment provided by Dr. Hoffman, the state agency reviewer, for a different conclusion, i.e., that Murphy can complete simple one- to two-step tasks and understand and carry out instructions.  Tr. 56, 149.  However, the ALJ did not cite to Dr. Hoffman's opinion regarding the paragraph B criteria.  The opinions of Dr. Hoffman and state agency reviewer Dr. Steiger could support such a conclusion because both reviewers found that Murphy has a mild restriction in activities of daily living.  Tr. 144-145, 127-128.  Dr. Steiger

---

[6]  With respect to activities of daily living, the regulations provide,

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

20 CFR Pt. 404, Subpt. P, App. 1, Listing 12.00(C)(1).

described Murphy's activities of daily living: "[she] cares for personal grooming, children, drives, does some [household] chores, shops, and pays bills.  She drives.  [She] organized and threw a baby shower for her daughter."  Tr. 126.   Dr. Hoffman explained that Murphy was "partially credible" and that her credibility assessment was based on Murphy's activities of daily living.  Tr. 146.  Dr. Hoffman wrote, "[Murphy's] allegations are credible in nature but not severity.  [She] alleges that she cannot be around other people.  [She] is able to drive and shop.  She also reported that she organized her daughter's baby shower."  Tr. 146.

However, the ALJ did not credit Dr. Hoffman's opinion with respect to her findings regarding the paragraph B criteria and did not credit the opinion of Dr. Steiger at all.[7]  At Step Three of her decision, the ALJ only referenced Murphy's ability to drive and perform self-care; she did not mention other findings by the state reviewers; i.e., that Murphy shops, does chores, cares for children, pays bills, and organized a baby shower.  Thus, it is not clear whether the ALJ relied on the opinions of Drs. Hoffman and Steiger in their entirety or in part.  Notably, there appears to be a disconnect between the ability to drive and perform self-care, on the one hand, and the "high degree of independence, appropriateness, effectiveness and sustainability of activities" assessed by the ALJ.  *See* 20 CFR Pt. 404, Subpt. P, App. 1, Listing 12.00(C)(1), quoted in note 6 above.

In her brief, Murphy asserts that she has marked restrictions in activities of daily living, noting that her appearance was described as "generally unkept"; she did not engage in much activity during the day; she relied on her children to do the cooking, chores, and shopping; and her treating physician, Dr. Ahn, assessed an RFC of 40.  Doc. 9, p. 15.  The evidence Murphy cites could arguably equate to a marked restriction in activities of daily living.

---

[7]  In their briefs, neither Murphy nor the Commissioner refer to the opinions of Drs. Hoffman and Steiger with respect to the paragraph B criteria.  Only Murphy cites to Dr. Hoffman's RFC finding.  Doc. 9, p. 13.

Because the ALJ did not sufficiently explain her determination that Murphy is mildly restricted in activities of daily living and because it does not obviously follow that driving and performing self-care equates to a high degree of independence, appropriateness, effectiveness and sustainability of activities, the ALJ's decision does not lend itself to meaningful review. Any attempt by the undersigned to search for evidence in the record not cited by the ALJ that might support the ALJ's conclusion in an effort to uphold that conclusion would, therefore, constitute post-hoc rationalization, which a reviewing court is not permitted to engage in. *See S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947) ("a reviewing court ... must judge the propriety of [agency] action solely by the grounds invoked by the agency"). Accordingly, the ALJ's explanation for finding that Murphy has mild limitations in activities of daily living is insufficient. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 416 (6th Cir. 2011) (failure of the ALJ to analyze whether claimant's impairments met or equaled a Listing at Step Three is error; "the ALJ needed to actually evaluate the evidence, compare it to [the Listing], and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.").

### 2. Social functioning

The ALJ stated,

> In social functioning, the claimant has moderate difficulties. The claimant testified that she has difficulty interacting with others. She describes punching holes in walls because of anger, and fighting with her children and her neighbor.

Tr. 53. Again, the ALJ does not explain what, if any, opinion evidence she relied on to find moderate difficulties. Her cited evidence—punching holes in walls and fighting with others— appears to be of more than moderate severity. Although Drs. Hoffman and Steiger both found moderate restrictions in social functioning, the ALJ does not discuss their findings. Because the

undersigned is unable to conduct a meaningful review of the ALJ's finding, and because the evidence the ALJ cited as well as other evidence in the record could support a marked restriction in social functioning,[8] the ALJ's explanation is faulty.

Because the ALJ's explanations were insufficient and Murphy has cited evidence that may support a finding of marked restriction in two of the three areas in the paragraph B criteria, remand is warranted for reconsideration of the paragraph B criteria.[9]

### C. The "paragraph C criteria"

A claimant can also meet Listing 12.04 by meeting the paragraph C criteria.  The ALJ stated that "the evidence fails to establish the presence of the 'paragraph C criteria" and recites the standard for meeting the paragraph C criteria without further explanation.  Murphy argues that she can meet the paragraph C criteria because she has a medically documented history of a chronic affective disorder of at least two years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and she has a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause her to decompensate.  Doc. 9, p. 17; *see* Listing 12.04, 20 CFR Pt. 404, Subpt. P, App. 1.

When discussing the opinion evidence later in her decision, the ALJ stated that, although Dr. Evans found Murphy to be markedly impaired in her ability to withstand stress and pressure, "later testing" indicated that "she is capable of performing tasks commensurate with unskilled activity."  Tr. 56.  The ALJ appears to be referring to the opinion of consultative examiner Dr.

---

[8]  For example, Murphy identifies evidence in the record that she is isolated and has a history of domestic violence. Doc. 9, p. 16; Tr. 309, 905.  *See* Listing 12.00(C)(2), 20 CFR Pt. 404, Subpt. P, App. 1 ("You may demonstrate impaired social functioning by, for example, a history of altercations, ... or social isolation." ).

[9]  The ALJ's finding that Murphy has a moderate restriction in concentration, persistence and pace is well-explained and supported by the record.  Tr. 53.

Smith.  It is not clear what "later testing" the ALJ believes Dr. Smith, or anyone else, provided, and how the later testing modified Dr. Evans' finding of marked impairment.[10]  Dr. Smith found that Murphy "will have difficulty dealing effectively with work pressure since she responds quickly with anger" (Tr. 911), which does not on its face support the ALJ's apparent determination regarding Murphy's ability to adjust to mental demands and changes. Additionally, this portion of the ALJ's decision is not explained at Step Three.  *See Reynolds*, 424 Fed. App'x at 416; *see also Peshek ex rel. N.R. v. Comm'r of Soc. Sec.*, 2014 WL 5684386, at *13 (N.D.Ohio Nov. 4, 2014) ("Courts within this District have applied *Reynolds* and vacated and remanded cases where the ALJ provided only a conclusory statement and failed to conduct a meaningful step three analysis that compares the medical evidence to the applicable Listing and provides an "explained conclusion" as to why a claimant's impairments failed to meet or equal a Listing," collecting cases).

Because the ALJ failed to provide a meaningful Step Three analysis, the undersigned cannot conduct a meaningful review and cannot, therefore, conclude that the ALJ's decision is supported by substantial evidence.  On remand, the ALJ will have an opportunity to evaluate the medical opinion evidence and, if necessary, shed additional light on Murphy's limitations under the paragraph B and C criteria.  Accordingly, the undersigned does not address Murphy's related argument that the ALJ erred in her treatment of the opinion evidence.  *See Trent v. Astrue*, 2011 WL 841538, at * 7 (N.D. Ohio March 8, 2011) (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's treatment of opinion evidence might impact his findings elsewhere in his decision).

---

[10]  To the extent the ALJ was referring to cognitive testing by Dr. Smith, the record shows that Dr. Evans performed similar cognitive testing as Dr. Smith, with similar results.  *See* Tr. 598-599, 908.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **REVERSED and REMANDED** for further proceedings consistent with this opinion.

Dated: August 19, 2015

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)